IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

| | |
|---|---|
| PENNY BRAKE, | ] |
| | ] |
| Plaintiff, | ] |
| | ] |
| vs. | ] Case No: |
| | ] |
| HSCGP, LLC d/b/a LIFEPOINT HEALTH | ] JURY DEMAND |
| | ] |
| Defendants. | ] |

## COMPLAINT

Comes now the Plaintiff, Penny Brake, by and through counsel and for cause of action will respectfully show to the Court as follows:

### JURISDICTION and VENUE

1. This action involves the application of the Age Discrimination in Employment Act of 1967 ("ADEA"), as amended, 29 U.S.C. § 621, *et seq.*, and Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e, *et seq.* .

2. This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4).

3. The claims asserted in this action arose in Williamson County, Brentwood, Tennessee; therefore, proper venue for this action lies within the Middle District of Tennessee pursuant to 28 U.S.C. § 1391.

### ADMINISTRATIVE PREREQUISITES

4. Plaintiff has fulfilled all conditions precedent to the institution of this action under 42 U.S.C.A. § 2000e. A Notice of Right to Sue was issued on September 28, 2020, and received

by Plaintiff on September 30, 2020, a true and correct copy of which is attached hereto as Exhibit A.

## PARTIES

5. Penny Brake ("Ms. Brake" or "Plaintiff"), is an adult female individual and citizen of the United States who resides in Cheatham County, Ashland City, Tennessee.

6. At all relevant times, Plaintiff was an employee of Defendant HSCGP, LLC d/b/a LifePoint Health ("Defendant" or "LifePoint") within the meaning of the ADEA and Title VII

7. Defendant is a foreign limited liability company or similar business entity and regularly conducts business at 330 Seven Springs Way, Brentwood, Tennessee.

8. At all relevant times, Defendants engaged in commerce or in an industry or activity affecting commerce and employed twenty (20) or more employees for each working day during each of twenty (20) or more calendar workweeks in the current or preceding calendar year pursuant to 29 U.S.C. § 621, *et seq.*, the Age Discrimination in Employment Act.

## FACTUAL ALLEGATIONS

9. LifePoint Health, a spin-off from Hospital Corporation of America ("HCA"), was founded in 1999 with 23 community hospitals in nine states.

10. At the time, Ms. Brake had been working in HCA's treasury department for sixteen (16) years and was HCA's Treasury Manager for the last five (5) years.

11. In May of 1999, the founding CEO of LifePoint, Scott Mercy, recruited Ms. Brake from HCA to join LifePoint.

12. Mr. Mercy previously worked with Ms. Brake at HCA and was well aware of her experience in finance and accounting.

13. On May 19, 1999 Ms. Brake was hired as LifePoint's Director of Finance.

14. Ms. Brake performed admirably in her position.

15. In 2005, Ms. Brake was promoted to Vice President of Finance.

16. At all times material, Ms. Brake was the sole Vice President of Finance.

17. As Vice President of Finance, Ms. Brake handled a wide range of services including, but not limited to, managing treasury operations and cash management; financial planning and analysis ("FP&A"); corporate card programs; managed operations of the LifePoint Community Foundations; served as Treasurer of LifePoint Health PAC; and served as a member of both general and administrative committees for LifePoint Social Responsibility Program.

18. Plaintiff also assisted the Chief Financial Officer ("CFO") with various investor relations and shareholder relations duties.

19. As the Vice President of Finance, Ms. Brake answered directly to LifePoint's Chief Financial Officer.

20. During Ms. Brake's time with LifePoint, she served under six (6) different Chief Financial Officers- Ken Donahey (1999-2001), Mike Culotta (2001-2007), David Dill (2007-2009), Jeff Sherman (2009-2013), Leif Murphy (2013-2016), and most recently, Mike Coggin (2016-2018).

21. Ms. Brake was noted for not only her work ethic and skill, but also her leadership skills.

22. In fact, she led the Treasury Operations department for 10 years without any turnover whatsoever.

23. In early September 2016, CFO Leif Murphy announced he was resigning.

24. Thereafter, Mike Coggin was named LifePoint's Chief Financial Officer.

25. On September 15, 2016, Mr. Coggin informed Ms. Brake that he was going to make some changes to the organizational structure to "improve efficiency and information flow."

26. Mr. Coggin informed Ms. Brake that he was taking this opportunity to give more responsibilities to two of his direct reports; Vice President of Accounting and Financial Reporting Michael Grooms and Vice President of Accounting/General Ledger Phillip Clark.

27. Mr. Coggin told Ms. Brake that Mr. Grooms was the only person within the organization that he trusted to give him good information and that he wanted everything that came to him reviewed by Mr. Grooms first.

28. As part of the restructuring, Mr. Coggin moved the treasury staff, who previously reported to Ms. Brake in the finance department, under Phillip Clark in the accounting department.

29. Additionally, Mr. Coggin moved FP&A, which previously reported to Ms. Brake, reporting directly to himself.

30. Throughout her employment, accounting and finance were, and still are, two distinct departments.

31. Mr. Coggin informed Ms. Brake that he wanted her to take over all aspects of investor relations as he knew little about that side of the business.

32. Investor relations had never been an independent position, rather, it was merely a duty that Ms. Brake assisted with in addition to her primary duties.

33. Ms. Brake subsequently took over responsibilities for all investor relations activities, including healthcare conferences and road shows with analysts and became the initial contact with investors.

34. As part of her duties, Ms. Brake was responsible for making LifePoint "look good" for potential investors and/or buyers.

35. During the February 2017 monthly meeting, Ms. Brake requested a meeting with Human Resources to finalize her job description after the restructuring.

36. Additionally, Mr. Coggin asked Ms. Brake where she sees herself going and how she thought she could add value to LifePoint.

37. Ms. Brake told Mr. Coggin that she was adding value in treasury and finance before he moved her to investor relations and pointed out the many ways in which she brought value to the company over the years.

38. On May 19, 2017, Plaintiff attended a meeting with Mr. Coggin and Mr. Grooms.

39. During the May 2017 meeting, Mr. Coggin made the decision to move the treasury team to the fourth floor with the accounting team.

40. Mr. Grooms expressed concern with this decision, specifically stating that the treasury team was upset with the decision to transfer them from reporting to Ms. Brake to reporting to Mr. Grooms.

41. Mr. Coggin then asked Ms. Brake, "Why do people love you so much? Are you easy on them? You should be hard on people like me and Michael."

42. Following the meeting, several members of the treasury team provided letters explaining why they respected Ms. Brake so highly.

43. In December 2017, Mr. Coggin asked Ms. Brake to take over the Treasury Department again because Mr. Clark was not devoting the proper time to the department's development and relationships with the Treasury banks.

44. Effective December 2017, Ms. Brake once again took over responsibility of the Treasury Department, in addition to handling Investor Relations duties.

45. In June 2018, Ms. Brake again requested an updated job description to no avail.

46. In September 2018, Mr. Coggin informed Ms. Brake he was changing the reporting structure for some of his direct reports.

47. As a result of the changed reporting structure, Ms. Brake began reporting to Mr. Grooms.

48. On November 16, 2018, a merger/acquisition between LifePoint and RCCH HealthCare Partners was finalized and announced.

49. The day the merger was announced, Mr. Coggin went into Ms. Brake's office and informed her that her Investor Relations position was being eliminated as a result of the merger and she would be terminated in the near future.

50. Ms. Brake's position was not Investor Relations, it was Vice President of Finance.

51. Ms. Brake was told her termination was part of a "Reduction in Force."

52. However, Ms. Brake was the only member of the treasury department who was let go.

53. She was also the only female direct report of Mr. Coggin's who was let go.

54. Mr. Coggin told Ms. Brake that he would like her to work through the transition period and for her and Mr. Grooms to determine when her final date of employment would be.

55. Ms. Brake asked Mr. Coggin if everyone on her team was safe and secure in their jobs; Mr. Coggin assured her they were.

56. After work on November 16, 2018, Plaintiff called Mr. Grooms and negotiated her last day of work to be December 14, 2018.

57. During this conversation, Mr. Grooms expressed his desire for Ms. Brake to stay longer.

58. On December 4, 2018, Plaintiff arrived at work to learn her system access had been terminated.

59. Ms. Brake contacted Information Technology and was told Mr. Coggin advised them to disable her access on November 30, 2018.

60. As a result, Ms. Brake's final day with Defendant was December 4, 2018.

61. On December 6, 2018, Mr. Coggin, Mr. Grooms, and Elliot Brown met to discuss Investor Relations plans going forward.

62. Following this meeting, Mr. Grooms continued to work with the Investor Relations consulting company to determine the plan going forward and what was required of them for private quarterly conference calls and Investor Relations Healthcare Conferences.

63. Plaintiff was the only direct report of Mr. Coggin's who was let go.

64. Plaintiff was the only woman who reported directly to Mr. Coggin.

65. Plaintiff was the oldest person who reported to Mr. Coggin.

66. Plaintiff was one of two employees who had been with the company since its inception.

67. According to an FP&A staff member who had access to salaries, Plaintiff was the lowest paid VP on Mr. Coggin's team.

68. On or around January 2nd, 2019, a LifePoint employee notified Ms. Brake an email had been sent out announcing Elliot Brown, Senior Director of Financial Reporting from the accounting department, had been promoted to Vice President of Finance.

69. At the time of her termination, Plaintiff was fifty-nine (59) years old.

70. Mr. Brown was 34 years old at the time he replaced Ms. Brake as Vice President of Finance.

71. Mr. Brown was twenty-five (25) years younger than Ms. Brake and outside the protected class (under 40).

72. Mr. Brown had no prior experience with treasury or cash management.

73. Mr. Coggin stripped Ms. Brake of her treasury and finance duties in favor of his younger, male reports.

74. Mr. Coggin then used Ms. Brake's knowledge and experience in Investor Relations to make LifePoint look better for potential investors/buyers, knowing LifePoint was looking for a potential merger.

75. Once the merger was complete, Ms. Brake was terminated in favor of a younger, male employee.

76. Ms. Brake was subjected to disparate treatment and terminated based on her age and her gender.

77. Any other reasons proffered by Defendant are pretext.

## COUNT I – AGE DISCRIMINATION
## (29 U.S.C. § 623(a)(1))

78. Plaintiff hereby re-alleges the foregoing paragraphs as though fully set forth herein.

79. Plaintiff asserts Defendant discriminated against plaintiff and interfered with her rights in violation of the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. 621, *et seq*.

80. At said dates and times as set forth herein, Plaintiff was over the age of forty (40).

81. Plaintiff's co-workers and supervisors treated her differently and less favorably than younger employees.

82. Plaintiff was treated poorly and received disparate treatment as compared to younger employees who were similarly situated.

83. Defendant violated the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* by wrongfully discriminating against Plaintiff on the basis of her age.

84. There is a causal connection between Plaintiff's age and her discharge.

85. At all relevant times set forth herein:

    (a) Plaintiff was over forty years of age and was qualified to perform the required job duties.

    (b) Plaintiff was discharged;

    (c) Plaintiff's position was filled or replaced by a substantially younger person;

    (d) Age was the determining factor in the Defendant's decision to discriminate against the Plaintiff and to discharge Plaintiff; and

    (e) Defendant did not have a legitimate, non-discriminatory reason for discharging Plaintiff.

86. As a direct and proximate result of the actions of Defendant set forth above, Plaintiff has suffered, is now suffering, and will continue to suffer, emotional pain and mental anguish.

### COUNT I I– SEX DISCRIMINATION
### (42 U.S.C. § 2000e-2(a)(1)

87. Plaintiff hereby re-alleges the forgoing paragraphs as though fully set forth herein.

88. Plaintiff is a female and a member of a protected class under Title VII of the Civil Rights Act.

89. Plaintiff was qualified for her position.

90. Plaintiff was subjected to disparate treatment because of her sex in violation of Title VII of the Civil Rights Act.

91. Defendant is vicariously liable for the actions of its management and supervisors.

92. As a direct and proximate result of the actions of Defendant set forth above, Plaintiff has suffered, is now suffering, and will continue to suffer, emotional pain and anguish.

93. As a direct and proximate result of such actions, Plaintiff has been, is being and will be in the future, deprived of income in the form of wages and of prospective benefits due to the Plaintiff solely because of Defendant's conduct.

**WHEREFORE**, Plaintiff requests this court enter judgment in favor of the Plaintiff and against Defendant, for:

(1) all amounts of back pay, front pay, wages, employment benefits, or other compensation denied or lost by Plaintiff as a result of Defendant's adverse actions against Plaintiff;

(2) a judgment against the Defendant for damages, both compensatory and punitive, in an amount to be determined at trial;

(3) liquidated damages pursuant to the ADEA;

(4) a tax offset to neutralize the tax burden of any award;

(5) attorney's fees, interest and costs; and

(6) any such other legal or equitable relief as may be appropriate or to which she may be entitled under federal or state law.

Respectfully Submitted,

**THE EMPLOYMENT AND CONSUMER LAW GROUP**

/s/ *G. BRANDON HALL*
**JONATHAN A. STREET, BPR No. 021712**
**BRANDON HALL, BPR No. 034027**
1720 West End Ave., Ste. 402
Nashville, TN 37203
(615) 850-0632

*Attorneys for Plaintiff*